UNITED STATES, Appellee,

v.

Kristen GILBERT, Defendant,
Appellant.

No. 98–1563.

United States Court of Appeals,
First Circuit.

Heard March 3, 1999.

Decided June 21, 1999.

Harry L. Miles, with whom Green, Miles, Lipton, White & Fitz–Gibbon, were on brief for appellant.

William M. Welch, II, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, were on brief for appellee.

Before Boudin, Circuit Judge, Bownes, Senior Circuit Judge, and Stahl, Circuit Judge.

BOWNES, Senior Circuit Judge.

Defendant-appellant Kristen Gilbert was charged in a single-count indictment with making a telephone bomb threat on September 26, 1996, to the Department of Veteran's Affairs Medical Center (VAMC) in Leeds, Massachusetts, in violation of 18 U.S.C. § 844(e). Gilbert was found guilty by a jury and was sentenced to imprisonment for fifteen months and three years of supervised release. We affirm.

There are three issues for review: (1) Was there subject matter jurisdiction under the interstate commerce clause; (2) Did the district court commit reversible error in the exclusion and allowance of certain evidence; (3) Was the evidence sufficient under the reasonable doubt standard to sustain the jury's finding of guilt.

**I**

We state the facts as they could have been found by the jury.

Gilbert, a registered nurse, worked the 3:30 p.m. to midnight shift on Ward C, an acute medical ward at the VAMC. James Perrault was a VAMC police officer who worked the 3:00 p.m. to 11:00 p.m. shift at the medical center. In the summer of 1995 Gilbert and Perrault became friendly. The friendship blossomed into a full-blown affair in September and October of 1995. At the time Gilbert was married. In November, 1995, Gilbert filed for divorce against her husband, Glenn Gilbert, and moved out of their home.

In February, 1996, an investigation was launched at the VAMC because of some suspicious occurrences at the hospital. The investigation became an official crimi-

nal investigation in a few months. Gilbert was one of the targets of the investigation. Many employees at the VAMC were interviewed and grand jury subpoenas were served on some employees.

Gilbert was photographed and handwriting samples were taken from her. Gilbert was upset by the investigation and made her feelings known. She told her former husband (the divorce had become final) that he had the right not to speak to the investigators. After he had spoken to them anyway, she became angry and upset. She disparaged him to several people by belittling him and using epithets to denigrate him. Gilbert also expressed anger and resentment against those of her co-workers who cooperated with the investigation. She told a co-worker that "maybe they ought to investigate" Gilbert's nursing supervisor. Gilbert became upset and angry with some of her co-workers on the evening shift because they would not talk to a private investigator she had retained.

Gilbert talked about the investigation with Perrault. She told him that three nurses who worked in Ward C were responsible for starting the investigation and she "couldn't understand why they were trying to do this to me." Perrault suggested leaving the area, but Gilbert refused, saying she "wanted everybody here to see what they had done to ruin her life." Perrault tried to end their relationship in June of 1996, but she begged him not to do so. In late July, 1996, Gilbert told a friend of hers that if Perrault "dumped her, she probably would start stalking him." Perrault tried again in late August of 1996 to break his relationship with Gilbert. She became upset and blamed the investigation for this.

In September, 1996, Perrault told Gilbert of the day and time he had agreed to be interviewed in Springfield, Massachusetts, by investigators from the United States Attorney's Office. Gilbert became upset and begged Perrault not to attend the interview. On the day of the inter-view, Gilbert blocked Perrault's car with her car as he attempted to drive out of his driveway. She asked Perrault to talk to her and not to go to the interview. When Perrault made it clear that he would not do as she wished, she returned to her car and drove off. On arriving at Springfield, Perrault used a parking garage that he and Gilbert had used on prior occasions. When Perrault returned to his car after the interview he found that air had been let out of his right front tire.

During the next several days Perrault's car was stained by egg yolks from eggs that had been thrown at it, the windshield was spray-painted, scratches were made on the exterior by keys, and the front license plate was damaged. After the damage to the license plate, Perrault saw a car similar in appearance to Gilbert's enter the parking lot that Perrault used.

Gilbert denied that she was responsible for the damage to Perrault's car, but admitted she had been in the parking lot prior to and after the bomb threat to the VAMC on September 26, 1996. Gilbert called a neighbor of hers on two occasions to ask if Perrault had been checking on her. When told that Perrault had inquired about her, the neighbor testified that Gilbert became very angry and said, "Twit, fucking twit," in what the neighbor described as a deep controlled tone of voice.

Starting in mid-September Perrault received a number of phone calls at his residence. There was no voice communication, only heavy breathing or hang-ups. Perrault unsuccessfully tried to trace the calls. He contacted NYNEX which traced seven of the calls to Gilbert's telephone number. A pen register was installed on Gilbert's phone on September 26, after the bomb threat. The pen register showed that, between September 26 and October 1, 1996, about one half of Gilbert's phone calls to Perrault used a method (called the "*67 function") which prevented Perrault from tracing her calls from his own telephone.

On September 26, the day of the bomb threat that was the basis of the indictment, Gilbert purchased a "Talkgirl Jr." with her VISA credit card at Toys–R–Us. She also bought several packages of Energizer batteries from a Thrifty Drug Store about an hour after the "Talkgirl Jr." purchase. The batteries could be used to activate the "Talkgirl Jr." The toy is a hand-held voice changer that records a statement which can be played back at a higher or lower speed than the original recording. Words recorded by a woman played back at a lower speed make them sound like a man's voice.

On September 26, the following message was received at 3:34 p.m. on the telephone answering machine of Glenn Gilbert, divorced husband of defendant-appellant: "I just wanted to say goodbye for the last time. Goodbye." Glenn Gilbert described the voice as "an altered voice, an almost haunting voice."

On September 26, Perrault was on patrol for two hours at the VAMC and then took over the security desk at 5:00 p.m. Gilbert's neighbor saw her leave her apartment about 5:00 p.m. Gilbert knew that Perrault would be at the security desk for two hours starting at 5:00 p.m. She also knew the direct dial telephone number for the security desk.

Perrault answered a security desk phone call at 5:11 p.m. A recorded message from an unidentified caller stated: "This message is for all Persian Gulf veterans who were exposed to chemical weapons." Perrault was a Persian Gulf War veteran and Gilbert knew it. Perrault described the telephone voice as "staticky, almost like there was a mechanical ring to it." Perrault dismissed the call as a prank.

From 5:22 p.m. through 7:07 p.m. during the evening of September 26, Perrault received a series of unidentified phone calls at the security desk. He described the voice as being exactly the same as the one directed to Persian Gulf veterans. The messages received were as follows:

| Content of Messages | Time |
| --- | --- |
| "There are three explosive devices in Building One. You have two hours." | 5:22 |
| "Nothing will compare as to what is going to happen tonight." | 5:30 |
| "I want those patients out on time. Remember." | 5:36 |
| "Would you like to know where to locate the devices?" | 5:40 |
| Undiscernable. | 5:45 |
| Undiscernable (small plane heard) | 5:50 |
| "You sound dumb or you would go . . ." | 5:55 |
| "You mustn't think this is very serious, just sitting in your office answering the phone." | 6:10 |
| "You must be pretty stupid . . ." | 6:18 |
| Undiscernable. | 6:25 |
| "You find this exciting, don't you?" | 6:48 |
| "This is my last call. In twenty-five minutes, I'll see you in hell." | 6:51 |
| "It's your job to think about the patients. I do care, but the Government needs a message." | 7:07 |

All of the phone calls had the same ring pattern, indicating that they were made from outside the VAMC. An officer, other than Perrault, answered the 5:30 call. He described the voice as distorted, not a normal voice—"like some kind of tape recorder."

As a result of the bomb threat, fifty acutely ill patients were moved by wheelchairs and stretchers from the building containing Ward C and Ward C Annex to another building several hundred yards away. No explosive devices were found in the building.

On the evening of September 27, Perrault received two anonymous telephone calls while on duty at the security desk. He described the voice as exactly like that of the caller on September 26. Gilbert's telephone toll records did not show any calls from her home at the time of the September 27th calls.

After listening again to the taped calls made on September 26, Perrault noticed that certain tones of the caller sounded very familiar. He described the caller as sounding hurt, upset, taunting, provoca-

tive, cold, and unfeeling. He also noticed that the calls seemed directed at him personally. He was of the opinion that the caller was Gilbert.

On September 28 and 29 Perrault was off from work and was not on duty at the VAMC. No anonymous phone calls were received at the VAMC on either of those days.

On September 30, Gilbert told her neighbor (O'Donnell) that she had gone to the Holyoke Mall and visited an Internet coffee shop. She said that she had logged onto the Internet and obtained a bomb recipe which she said was "easy to find."

About 6:25 p.m. on the 30th, Gilbert bought a "Talkboy Jr." and the batteries to run it at Toys–R–Us with a personal check. Like the "Talkgirl" the "Talkboy" is a voice changer and operates in the same manner. The cashier who sold the toy to Gilbert remembered that Gilbert wanted to be sure that the batteries worked with it and that Gilbert told her she wanted the toy for her nephews. Gilbert does not have any nephews.

At 6:44 p.m. on September 30, Perrault received a phone call stating, "Officer Perrault, I've been watching you, boy." Perrault described the voice as the same as the one who made the call on September 26, except that this time the caller appeared to be "trying to put a southern drawl into it." Perrault received two more calls on September 30. The caller sounded the same as the one who had made the first call that evening.

On the same evening, September 30, other departments at the VAMC, i.e., Admissions and the Nurses' Station on Ward C, also received unidentified phone calls. Those who received the calls described the voice as sounding electronically altered or as a mechanical-sounding voice.

After finishing his shift on September 30, Perrault went to the local Veterans of Foreign Wars (VFW) Club about midnight. Shortly after arriving he received a phone call at the bar. The caller stated:

"You think you have a problem? Just wait and see what I have planned for you." Perrault recognized the voice as being the same as the one in the prior phone calls. Gilbert knew that Perrault usually stopped at that VFW on the way home from work. In fact, she had met him there on several prior occasions, without notice beforehand. On this same day, September 30, Perrault received a letter from Gilbert in which she said that as she drove by the VFW one evening she saw his car and stood outside and watched him through a window playing darts.

On October 1, 1996, Perrault met with investigators and it was agreed that he would call Gilbert when he started his shift on the security desk at 5:00 p.m. Surveillance of a number of pay telephone booths in the vicinity of Gilbert's apartment was arranged for that evening. Perrault called Gilbert at 5:12 p.m. and left a message on her answering machine that he would be at the security desk until 7:00 p.m. Perrault received a series of anonymous phone calls at 5:25 p.m., 5:41 p.m., 5:44 p.m., and 6:37 p.m. The voice was the same as that of the prior anonymous calls. Another officer on duty received an anonymous call at 7:35 p.m. He described the voice as strange, male-sounding and distorted. The 5:41 p.m. and 5:44 p.m. calls were traced to telephone pay stations at a Citgo gas station and the Daily Hampshire Gazette. Gilbert later admitted to Perrault that she had used those pay phones, but denied making any of the phone calls in question.

Shortly before the 6:37 p.m. pay-booth phone call, Massachusetts State Trooper Kevin Murphy, who was on surveillance, saw Gilbert arrive in her car at the Tasty Top, an ice cream stand, and use the pay telephone booth outside of it. Trooper Murphy radioed to Special Agent Plante (a member of the surveillance team). Plante contacted Perrault at the VAMC security desk, who confirmed that he had just received a call in which there was traffic noise and heavy breathing noise.

A fingerprint from Gilbert's right index finger was lifted from the telephone receiver at the Tasty Top phone booth. Gilbert later told Perrault that she had made a phone call from the Tasty Top booth to check her answering machine and that she had seen a State Trooper at the Tasty Top.

On the evening of October 1, 1996, a search warrant was executed at Gilbert's apartment. Trooper Murphy seized from the trash three empty battery packages for Energizer batteries, two batteries stamped LI54 on the back, and a Thrifty Drug Store receipt showing the purchase of the Energizer batteries. Detective Lieutenant Thomas Soutier also seized a "Talkboy" from a closet in a child's room which contained a tape cassette that was blank. Agent Plante seized operating instructions for the "Talkboy" from the left pocket of Gilbert's outdoor jacket, which Agent Plante found lying on her bed. Agent Plante also found a Daily Hampshire Gazette, dated September 27, 1996, on Gilbert's bed that contained an article about the bomb threat.

While the police were executing the search warrant, Gilbert went over to her neighbor's (O'Donnell) apartment. Gilbert told O'Donnell that the police were looking for a voice-changing device, similar to a toy that her son owned, that "could change your voice up high like a chipmunk or down low like a man." She also told O'Donnell that if the police found such a device in her house, it might be broken, the tape might be erased or blank, or the batteries might be dead. The investigators never told Gilbert that they were looking for a child's toy that could change a person's voice. The VAMC did not receive any more telephone calls from the anonymous caller after October 1st.

Bruce Koenig, a government expert, tested the "Talkboy" and determined that the variance in speed from low to high speed on the "Talkboy" was 31.1%. Koenig increased the playback speed for exhibit 13, the tape containing the September 30th

phone calls, by 31.1%. The telephone calls on exhibit 13 were tape-recorded messages; the messages had been pre-recorded on the "Talkboy", and then played back at a slower speed. Mr. Koenig created a speed-corrected tape of exhibit 13, which became exhibit 44.

One of Gilbert's friends, Ms. Abderhalden, who had known and worked with Gilbert for over five years and had talked to Gilbert daily in the fall of 1996, identified the voice on exhibit 44 as Gilbert's voice, as did Glenn Gilbert her former husband.

## II

■ We first turn to the interstate commerce-jurisdiction issue. Gilbert argues that because there was no evidence "that the telephone system used was more than an intrastate system, or that the threat call was routed through an interstate system," there was no effect on or nexus to interstate commerce. Appellant's Br. at 19. This claim is one of the many that have surfaced in the wake of *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). And, as with most of the others, the claim fails to float.

Before starting our legal analysis, we address the government's suggestion that Gilbert's claim was procedurally defaulted and is reviewable only for plain error. We do not have to resolve the issue because we do not think there was error, plain or otherwise.

We now proceed to our analysis of the interstate commerce-jurisdictional question. The first paragraph of *Lopez* summarizes the case:

In the Gun–Free School Zones Act of 1990, Congress made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A)(1988 ed., Supp. V). The Act neither regulates a commercial activity nor contains a requirement that the possession be connected in any way

to interstate commerce. We hold that the Act exceeds the authority of Congress "[t]o regulate Commerce ... among the several States...." U.S. Const., Art. I, § 8, cl. 3.

*Lopez*, 514 U.S. at 551, 115 S.Ct. 1624.

*Lopez* does not apply because a telephone is an instrumentality of interstate commerce and this alone is a sufficient basis for jurisdiction based on interstate commerce.

In *Lopez* itself the Court held:

First, Congress may regulate the use of the channels of interstate commerce.... *Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat comes only from intrastate activities* .... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce ..., i.e., those activities that substantially affect interstate commerce.

*Id.* at 558, 115 S.Ct. 1624 (emphasis ours, cites and quotes omitted.) The Court held that the statute at issue in *Lopez* fell into the third category and could only be sustained "as a regulation of an activity that substantially affects interstate commerce," *id.* at 559, 115 S.Ct. 1624. In the present case, we are dealing instead with the second category.

Shortly after *Lopez* was decided the Court issued a per curiam opinion in *United States v. Robertson*, 514 U.S. 669, 115 S.Ct. 1732, 131 L.Ed.2d 714 (1995). The case was brought under the Racketeer Influenced and Corrupt Practices Act (RICO) on the basis that defendant had invested proceeds obtained from unlawful acts proscribed by RICO, in the purchase and operation of a gold mine. Section 1962(a) prohibits the "acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

The Ninth Circuit reversed defendant's conviction on the ground that the government had failed to prove that the gold mine "was engaged in or affect[ed] interstate commerce." *Id.* at 670, 115 S.Ct. 1732. The Court did not consider the "affecting" commerce question. It pointed out that the evidence showed conclusively that the gold mine itself was engaged in interstate commerce activities. These activities "assuredly brought the gold mine within § 1962(a)'s alternative criterion of 'any enterprise ... engaged in ... interstate or foreign commerce.'" *Id.* at 672, 115 S.Ct. 1732. This case is not precisely on point but it illustrates that "affecting interstate commerce" is not the sole test to use in determining whether there is interstate commerce jurisdiction.

There are cases directly on point: *United States v. Kunzman*, 54 F.3d 1522, 1527 (10th Cir.1995), held: "As long as the instrumentality used is itself an integral part of an interstate system, Congress may regulate intrastate activities involving the use of the instrumentality under the federal securities laws."

The intrastate telephone call cases are of long standing but like old wine have a pertinent robust taste. *Loveridge v. Dreagoux*, 678 F.2d 870, 874 (10th Cir. 1982), held: "[P]roof of intrastate telephonic messages in connection with the employment of deceptive devices or contrivances is sufficient to confer jurisdiction in a § 10(b) and Rule 10b–5 action." In *Alley v. Miramon*, 614 F.2d 1372, 1379 (5th Cir.1980) the court held: "This court has consistently held that the intrastate use of the telephone may confer jurisdiction over a private action under Section 10(b) and Rule 10b–5." In *Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731 (10th Cir.1974) the court explained cogently the reason for the telephone-call rule:

Both intrastate and interstate telephone communications are part of an aggregate telephonic system as a whole. And as long as the instrumentality itself is an integral part of an interstate system,

Congress has power, when necessary for the protection of interstate commerce, to include intrastate activities within its regulatory control.

*Id.* at 738 (citation omitted).

The use of the telephone in this case to make a bomb-threat was, without more, sufficient to sustain jurisdiction under the interstate commerce clause.

### III

■ The first evidentiary issue is rather unique and requires explanation. Prior to the bomb threat, Gilbert and some others were the subject of an investigation by the VAMC police and other police agencies. The investigation was prompted by unexpected deaths at the VA hospital. That there was an ongoing investigation was common knowledge at the VAMC and in the outside community.

Prior to trial, the district court discussed with counsel how to handle the introduction of the fact that there was an investigation going on and that Gilbert was one of those being investigated. The court told counsel that he would not exclude entirely the fact that there was an investigation in process because the case "flowed" around the investigation. After a lengthy pre-trial conference on the instructions to be given to the jury, the following instruction was given at the outset of the trial:

Here is my preliminary instruction to you. I want to instruct you now on part of the background of this case. Beginning around February 1996, seven months before the bomb threat charged by the Government in this case, an independent investigation began about certain possible wrongdoing at the VA.

That separate investigation had nothing to do with the charge in this case. The supposed wrongdoing involved something else entirely. For a time that separate investigation included within its scope, among other people and things, the defendant here Kristen Gilbert.

I'm not going to tell you about the specifics of that other separate suspected wrongdoing because to do so would give that supposed misconduct more weight than it deserves. I have also instructed counsel not to refer to the specifics of that investigation. I do want to emphasize a couple points however.

Nearly two years after that separate investigation first began, there is still no sufficient evidence that any wrongful act was ever committed by anyone.

Moreover, although at some point the investigation turned in part towards this defendant, Ms. Gilbert has never been charged with the wrongdoing that was the subject of that separate investigation. So as far as this trial is concerned, even assuming that the other wrongdoing ever actually occurred, she is not only entirely innocent of that separate misconduct, she has not ever been charged with it.

The fact that there was an investigation, however, and that for some time it included the defendant, among other persons and things within its scope, is part of the background of this case. You may hear references to that investigation, and I am therefore permitting you to know of the fact of that separate investigation.

Do not speculate about the subject matter of that separate investigation. It doesn't matter. Such speculation might distract you from your task in this trial, which is to determine whether the Government has proven beyond a reasonable doubt that the defendant phoned a bomb threat to the VA on September 26, 1996.

Keep in mind as well that the fact that a person is investigated for some separate wrongdoing is not evidence of any kind that the person is guilty of the crime they have actually been charged with.

You should not, as a matter of law and as a matter of fundamental fairness, assume in any way that Ms. Gilbert is or

might be guilty of phoning in a bomb threat simply because she happened to fall within the scope of a separate investigation involving something entirely different. The fact that she was included for a time in that separate investigation is simply not evidence against her in this case in any way.

As I have said, I am permitting the evidence of the existence of that separate investigation to come in this limited form simply to give you the background and context out of which the evidence in this case partly arises. Consider this evidence only in this light.

Gilbert took the position at trial that evidence of the other investigation should not have been admitted at all. She argues before us that its admission violated the provisions of Fed.R.Evid. 404(b), was an abuse of discretion, and deprived her of a fair trial. The government counters that the evidence was properly admissible under Fed. Rules of Evidence 401 and 403 and "in the alternative" under Fed.R.Evid. 404(b).

Prior to giving the jury instruction the court made the following rulings. It expressed doubt that the investigation evidence

constitutes the sort of other-act evidence that falls within the scope of Rule 404(b). I think the fact is that the evidence of the other investigation is connected to this case in a way that really makes it part of the Government's proof of the actual act that has been charged.

This isn't a pure other-act type of situation where, for example, the Government would be trying to prove that the defendant engaged in some kind of misconduct two or three years ago and therefore is likely to be guilty or possibly guilty of the charge that she's facing here at this time.

The court then acknowledged that it might be wrong about Rule 404(b)'s applicability and stated that it was "going to make a finding under Rule 404(b) to cover the situation:"

I want to make it clear that in permitting evidence of the other investigation to come in, I do find that it has special relevance in this case both on the issues of motive and identity, and that special relevance is entirely separate from any improper purpose that the evidence might be offered for, meaning propensity evidence.

I believe also that the probative value of the evidence outweighs any unfair prejudice that will be done to the defendant as a result of my letting this in, particularly in the context of the limiting instruction that I will give.

So I want to make sure that my specific findings are on the record to the extent that we are in the area of Rule 404(b). I also want to make it clear because this is close to 404(b) that I'm approaching it as if it were 404(b) evidence in assessing the probative weight versus the unfair prejudice.

We start our analysis with the three evidentiary rules implicated. Rule 401 defines relevant evidence. Rule 403 provides for the exclusion of relevant evidence on the grounds of prejudice, confusion or waste of time. The pertinent part of Rule 404(b) states:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

 Our standard of review of a district court's admission or exclusion of evidence is abuse of discretion.

We review a trial court's Rule 403 balancing test for an abuse of discretion, and only in "extraordinarily compelling circumstances" will we reverse a district court's "on-the-spot judgment" concern-

ing the probative value and unfair effect of the proffered evidence.

*United States v. Shea,* 159 F.3d 37 (1st Cir.1998); *United States v. Pitrone,* 115 F.3d 1, 7 (1st Cir.1997).

We do not think that the investigation evidence is barred by either Rule 403 or Rule 404(b). As the district court pointed out, it could be described as part of the proof that Gilbert was the one who made the telephone bomb threat. The jury could well have found that her reaction to the investigation as shown by what she said and did was the motive for the bomb threat. And proof of motive is one of the purposes for admitting evidence that would be otherwise excludable under Rule 404(b). Thanks to the admirable instruction given the jury on this matter and the rulings made in conjunction with it by the district court, we need go no further. We hold that the other investigation evidence was properly admitted.

■ The next evidentiary issue is more troublesome. It involves the admissions of expert testimony that resulted in the positive voice identification of Gilbert as the person who made the telephone calls on September 30, 1996 (subsequent to the bomb threat calls on September 26). Gilbert argues that the admission was erroneous for three reasons: (1) ambush, abuse of discretion, and deprivation of a fair trial; (2) the voice identifications were unduly suggestive, inherently unreliable, and constituted an abuse of discretion; (3) the trial court's refusal to give an adverse inference instruction constituted reversible abuse of discretion.

The procedural history of the voice identification is important. We first note that there was no mention of a positive identification of Gilbert's voice in the government's opening. We start our recital of the facts underlying this issue by pointing out that what took place is based in part on the representations of the prosecutor which the court obviously accepted. We make no suggestion that the prosecutor misrepresented the facts or the court erred in accepting the prosecutor's representations.

Trial started on Wednesday, January 7, 1998. On the weekend prior to trial, the prosecutor was "fooling around" with exhibit 13 on a play back tape recorder. Exhibit 13 consisted of tape recordings of phone calls made on September 30. Perrault received three phone calls during the evening of September 30. The voice on all three calls sounded the same to Perrault. On the same evening, there were unidentified phone calls made to various departments of the VAMC. The testimony of the recipients was that the voice sounded as being electronically altered or was a mechanical sounding voice.

As the prosecutor "fiddled" with the tape recorder that held exhibit 13, he became aware that when the play back speed of the recorder was increased that Gilbert's natural voice was heard. This discovery was confirmed on January 6. On January 7, after the trial started, the government sought to have Gilbert's ex-husband Glenn Gilbert, identify defendant's voice by playing exhibit 13 on a voice transmitter with a variable speed adjustment. The court sustained Gilbert's objection, subject to a change of ruling if the government obtained an expert witness. The court was of the opinion that allowing the government to vary the speed of the play back to obtain Gilbert's natural voice would be unreliable and too haphazard.

The government promptly contacted an expert, Bruce Koenig, who was in the business of analyzing audio and video tapes. Preparatory to testifying, he speeded up the play back so that Gilbert's natural voice was heard. This was recorded· on another tape, exhibit 44. It must be borne in mind that part of the government's theory on the voice identification issue was that Gilbert had made the September 30 phone calls on the "Talkboy" recorder that she bought on September 30 at 6:25 p.m. at Toys–R–Us.

Koenig delivered the tape he created (exhibit 44) to the government on Sunday, January 11, which immediately provided the defense with a copy of it and a statement of Koenig's proposed testimony.

On Monday, January 12, the prosecutor proffered Koenig as a witness. Gilbert objected on the grounds already stated. She also pointed out that she would be severely prejudiced because of the short amount of time she had to prepare for his testimony.

The court decided to admit the evidence but gave Gilbert several options among which was a short continuance. Gilbert declined the continuance but accepted the court's offer to allow her expert to testify out of order. Gilbert was also given an opportunity to voir dire Koenig, which she did for ninety minutes.

On January 13, Gilbert called her expert, Christopher Ryan. Ryan was a full-time musician, master engineer, and record producer. His testimony was that, after listening to the "Talkboy" tape, he was of the opinion that it was incapable of producing the conversation recorded on exhibit 44.

Koenig, the government's witness, testified as to how he had tested the "Talkboy" for variances in speed and then created a speed corrected tape of exhibit 13 which became exhibit 44.

There was testimony by two witnesses, a long time friend of Gilbert and Gilbert's ex-husband, that the voice on exhibit 44 was that of defendant.

 We do not doubt that Gilbert was surprised by the positive voice identification testimony. We do not think, however, that she was ambushed by it, if we define ambush as the government deliberately laying a trap for her to walk into. If the events leading to the discovery that speeding up of the September 30 tape recordings disclosed Gilbert's natural voice were as the prosecutor stated, there was no ambush, just a fortuitous discovery by the prosecutor the weekend prior to start of the trial. And even if we were skeptical about the prosecutor's assertion, we would be bound by the district court's decision to admit the evidence. "A district court's denial of a motion to suppress will be upheld if any reasonable view of the evidence supports the denial." *United States v. Watson*, 76 F.3d 4, 6 (1st Cir.1996). *United States v. de Jesus–Rios*, 990 F.2d 672, 677 (1st Cir.1993). And the standard of review of discovery decisions is abuse of discretion. *United States v. Samalot Perez*, 767 F.2d 1, 4 (1st Cir.1985).

We think that the district court's handling of this surprise evidence treated Gilbert fairly under the circumstances. She eschewed the offer of a short continuance and opted instead to put on her own expert out of order. The prosecutor had given her, as soon as it was available, a statement of the testimony of its expert that would be proffered at trial. And Gilbert was accorded an extensive voir dire of the government's expert before he testified before the jury. Significantly, Gilbert does not state how she was prejudiced by the late disclosure of the voice identification testimony or how it would have changed her defense strategy. *United States v. Melucci*, 888 F.2d 200, 203 (1st Cir.1989).

Moreover, Gilbert had been furnished a copy of exhibit 13 over a year prior to trial. She certainly had an opportunity to have her expert perform as many tests on it as necessary.

 Gilbert also argues on appeal that the court erred in not excluding Koenig's testimony on the grounds that it was scientific evidence and did not pass the reliability and validity tests of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The short answer to this argument is that there was no objection in the trial court on this basis. No suggestion was made by Gilbert that the *Daubert* principles should be applied to Koenig's testimony. Our rule is that an objection not made in the trial court will

not be considered in the first instance on appeal. *Cooperman v. Individual, Inc.,* 171 F.3d 43, 49 (1st Cir.1999); *Albion v. YMCA Camp Letts,* 171 F.3d 1, 2 (1st Cir.1999).

Gilbert's second contention is that the voice identifications were unduly suggestive and their admission an abuse of discretion because the witnesses already knew Gilbert's voice but were not given comparisons of tape recordings of other voices. In addition, both witnesses had listened to exhibit 44 prior to testifying and identified the voice as that of Gilbert. For these reasons, Gilbert says that the trial judge should have excluded the identifications in this case.

While there were certainly suggestive elements in this procedure, the Supreme Court has made clear that this does not violate due process if the identification remains sufficiently reliable, *see Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), *cf. Government of Virgin Islands v. Sanes,* 57 F.3d 338 (3d Cir.1995). Here, the witnesses were both familiar with Gilbert's voice and therefore had a solid basis for their opinion that the taped voice was Gilbert's, and the defense was free to bring out on cross-examination any aspects of suggestiveness, including the pretrial exposure of the witnesses to the tape. This was a judgment call by the district court under an abuse of discretion standard, and we do not think that the discretion was abused.

Moreover, there was sufficient evidence for the jury to convict without the voice identification of the September 30 "Talkboy" telephone calls. We summarize the evidence, omitting the voice identification testimony.

Gilbert purchased a "Talkgirl Jr." about three and one half hours before the bomb threat calls to the VAMC on the evening of September 26, 1996. The "Talkgirl Jr." could make a woman's voice sound like that of a man. Gilbert left her apartment eleven minutes before the first bomb threat calls were received at the VAMC. She did not return home for about three hours.

After listening to the tape recordings of the ten phone calls made on the evening of September 26, 1996, the first of which was the bomb threat, Perrault believed that they all were made by Gilbert. She admitted to Perrault that she watched from across the street as the building which the caller said "contained three explosive devices" was evacuated.

Personnel at the VAMC and Perrault received a number of unidentified phone calls over the next several days. The calls were made by someone who knew Perrault's work schedule, which Gilbert did. Some of the calls to Perrault were of a personal nature. Perrault believed that the voice on these calls was the same as the one that had made the bomb threat calls.

On September 27th, Gilbert purchased a "Talkboy Jr." which like the "Talkgirl Jr." could make a woman's voice sound like that of a man. She told the clerk from whom she made the purchase that it was a gift for her nephews. Gilbert does not have any nephews. The VAMC received an unidentified phone call about 15 minutes after the purchase. The caller's voice sounded the same as the other calls.

On October first, it was decided to conduct a surveillance of a number of pay phone booths in the vicinity of Gilbert's apartment. Perrault agreed to call Gilbert from the security desk at VAMC, which he did at 5:00 p.m. At 6:37 p.m. the VAMC received an unidentified phone call in the same voice as the others. At the same time Gilbert was observed by a state trooper making a phone call from a pay phone booth near her apartment. A fingerprint from Gilbert's right index finger was lifted from the receiver at the phone booth.

A warrant-authorized search was made of Gilbert's apartment during the evening

of October 1. A "Talkboy Jr." and other incriminating evidence was seized.

This evidence was sufficient *without* the voice identification evidence for a conviction. Because, however, the admission of the voice identification was not error, we need not decide whether it would have been harmless error.

The judgment of the district court is *affirmed.*