# United States Court of Appeals
## For the First Circuit

No. 00-2427

UNITED STATES,

Appellee,

v.

EDWARD T. PERROTTA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Lipez, Circuit Judge,
Coffin, Senior Circuit Judge,
and Barbadoro,* District Judge.

David N. Cicilline for appellant.

Donald C. Lockhart, Assistant United States Attorney, with
whom Margaret E. Curran, United States Attorney, and James H.
Leavey, Assistant United States Attorney, were on brief for
appellee.

May 6, 2002

_____
    * Of the District of New Hampshire, sitting by designation.

**LIPEZ, Circuit Judge**.  Edward Perrotta was convicted of conspiring with Rocco Folco and others to make extortionate extensions of credit, aiding and abetting Folco in making extortionate extensions of credit, and financing extortionate extensions of credit made by Folco.  He appeals on a number of grounds. Unconvinced by his arguments, we affirm his convictions.

## I. Background

In April of 1995, Perrotta loaned $50,000 to Folco at an interest rate of one percent per week (52 percent per year). Folco, in turn, loaned the $50,000 to Anthony Regine at an interest rate of two percent per week (104 percent per year).  Under Rhode Island law, annual interest rates in excess of 21 percent are not legally enforceable.  Regine testified, however, that he believed "something would happen to me or to my family" if he failed to make timely payments to Folco.

In March of 1999 a grand jury indicted Perrotta, Folco, and several others on various racketeering-related charges.  The indictment charged that Perrotta had financed extortionate extensions of credit from Folco to Regine, in violation of 18 U.S.C. § 893.  Most of the defendants pled guilty.  In March of 2000 the grand jury returned a superceding indictment which included the original count against Perrotta and also charged that he had conspired with Folco and others to make extortionate extensions of credit to Regine, in violation of 18 U.S.C. § 892, and that Perrotta had aided and abetted Folco in making

extortionate extensions of credit, in violation of 18 U.S.C. § 892 and § 2 (the general aiding and abetting statute).

Perrotta moved to dismiss the indictment on the ground that § 893 (proscribing the advancement of money to a person "with reasonable grounds to believe" that person intends to use it to make an extortionate extension of credit) encourages the jury to use a standard of proof less exacting than "beyond a reasonable doubt," in violation of the Due Process Clause of the Constitution. The district court denied his motion. Perrotta also moved to suppress weapons seized from his home and car which had not been described in the search warrant, and that motion was also denied. In addition, Perrotta objected unsuccessfully (in a motion in limine and at trial) to the admission into evidence of the seized weapons. After the jury convicted Perrotta on all charges, the court denied his earlier motions for a judgment of acquittal and sentenced Perrotta to 37 months in prison.

On appeal, Perrotta argues that the evidence was insufficient to support his convictions, that the district court erred in admitting into evidence weapons seized during a search of his home and car, that the seizure of the weapons violated the Fourth Amendment, and that 18 U.S.C. § 893 invites confusion in the application of the "beyond a reasonable doubt" standard and is therefore unconstitutional.

## II. Sufficiency of the Evidence

### A. The Charges

Under 18 U.S.C. § 892, "Whoever makes any extortionate extension of credit, or conspires to do so, shall be fined . . . or imprisoned not more than 20 years, or both."  Federal law also proscribes "willfully advanc[ing] money . . . to any person, with reasonable grounds to believe that it is the intention of that person to use the money . . . for the purpose of making extortionate extensions of credit . . . ."  18 U.S.C. § 893.  An "extortionate extension of credit" is

> [a]ny extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person.

18 U.S.C. § 891(6).  Recognizing that direct evidence of the understanding of the parties concerning the consequences of delayed repayment or non-repayment may be difficult to obtain, Congress enumerated four factors which, if all present, would constitute "prima facie evidence that the extension of credit was extortionate."  18 U.S.C. § 892(b).  The factors are "(1) that repayment is unenforceable through civil judicial process; (2) that the loan requires interest greater than 45% per year; (3) that the loan exceeds $100; and (4) that the debtor reasonably believes that the lender either has used [extortionate means] to collect other debts or has a reputation for doing so." United States v. Zannino, 895 F.2d 1, 11 (1st Cir. 1990) (summarizing 18 U.S.C. § 892(b)).

-4-

Instead of alleging that Perrotta's loan to Folco was extortionate, the government tried to implicate Perrotta as a participant in Folco's extortionate loan to Regine. Count One of the indictment charged that Perrotta had conspired with Folco to make extortionate extensions of credit to Regine, in violation of 18 U.S.C. § 892. To win a conviction on this count, the government had to prove that Perrotta and Folco agreed and intended that Folco would make an extortionate extension of credit to Regine (that is, that Regine would understand that Folco would, if necessary, resort to violence or other criminal means to collect). United States v. Escobar-de Jesus, 187 F.3d 148, 175 (1st Cir. 1999) ("To prove the elements of a conspiracy, the government must show beyond a reasonable doubt that the defendant and one or more coconspirators intended to agree and . . . to commit the substantive criminal offense which was the object of their unlawful agreement." (internal quotation marks omitted)).

Count Three charged that Perrotta had aided and abetted Folco in making extortionate extensions of credit to Regine, in violation of 18 U.S.C. § 892 and § 2. To win a conviction on this count, the government was required to prove that Perrotta knew that Folco's extensions of credit to Regine were extortionate and that Perrotta intended to assist Folco in making the extortionate loans. See United States v. Rosario-Diaz, 202 F.3d 54, 62 (1st Cir. 2000) (to support a conviction for aiding and abetting, the government must prove, in addition to the commission of the offense by the principal, that the defendant "consciously shared the principal's

-5-

knowledge of the underlying criminal act, and intended to help the principal.").

Count Two charged Perrotta with financing extortionate extensions of credit from Folco to Regine in violation of 18 U.S.C. § 893. To win a conviction on this count, the government had to establish that Perrotta had advanced money to Folco with "reasonable grounds to believe" that Folco would use the money to make an extortionate extension of credit. Id. If we conclude in evaluating the evidence that it was sufficient to establish that Perrotta knew of Folco's extortionate practices, we necessarily also conclude that he had reasonable grounds to believe that Folco would employ such practices.

Perrotta does not deny having loaned $50,000 to Folco, or that Folco then loaned the $50,000 to Regine. Nor does he dispute the government's claim that Folco's loan of $50,000 to Regine was extortionate. His sole contention is that the evidence was insufficient "to support a finding that Mr. Perrotta knew of the intention of Mr. Folco to employ violence in his collection efforts."

## B. Folco as Loan Shark

In weighing Perrotta's challenge to the sufficiency of the evidence against him, we view the evidence in the light most favorable to the verdict, and draw all reasonable inferences in favor of the verdict. United States v. Benjamin, 252 F.3d 1, 5 (1st Cir. 2001). There was ample evidence at trial that Folco was a loan shark, including a notebook in which Folco had recorded the

principal amount, interest rate, and payment schedule of over a dozen debts owed to him. The interest Folco charged on these loans was two to three percent per week. There was extensive evidence that it was Folco's practice to use violence and threats of violence to collect debts. For example, Folco explained to Gary Cedroni (a Folco associate) that one of his debt collectors, who had "just got out of the can" and was "half fucking nuts," would "crack" a debtor in order to "scare him enough" to secure payment.[1] In a second conversation, Folco told Cedroni that one of his debt collectors had "cracked [a debtor] on the mouth" on Folco's behalf and said "'You better have the money by six o'clock or else.'" In a third conversation, George Melillo (another Folco associate) indicated to Folco that the next time he encountered a certain debtor, Melillo would "smash him in the mouth . . . [k]nock him out cold." Folco suggested that the debtor be warned that if payment was not made within a week, he and his father would get "a beating." The surveillance tapes contained several other accounts of Folco's extortionate techniques.

---

[1] The conversations quoted in this opinion were obtained by means of electronic listening devices installed in Folco's home and a wiretap on Folco's telephone. (The government also installed a hidden camera outside Folco's home.) The government transcribed these conversations to assist the jury in understanding the surveillance tapes. Although it was the tapes, not the transcripts, that were admitted into evidence, our review was limited to the transcripts. At certain points in the transcripts Perrotta disputes the government's version of what was said, and we have noted those disputes.

## C. The Transactions

On April 22, 1995, Folco agreed to loan Regine $25,000 at an interest rate of two percent per week. Regine needed this money to pay off other loan sharks who were charging him even higher rates of interest.[2] Folco told Regine that he would get the money from a third party, who turned out to be Perrotta, and Regine expressed his understanding that Folco would "charge me a point," that is, one percent per week, on top of the interest the third party (Perrotta) would be charging Folco.

On April 24, Folco told Cedroni that he had said to "the old man" (Perrotta was 52 years old in 1995) that he "might need . . . 50,000 more." Folco reported that he had asked Perrotta "who am I gonna go to if I need that kind of money?", and "the old man" had responded: "Me! Come to me. . . . I'll give you anything you want." That same day, Perrotta telephoned Folco, and the following conversation ensued:

> Perrotta: Hey, I got you a putter for ya.
>
> Folco: Yeah.
>
> Perrotta: Do you want me to bring it over tomorrow?
>
> Folco: Yeah.

They agreed that Perrotta would deliver the "putter" at 8:30 the next morning. Also on April 24, Folco told Regine "[o]ne guy is gonna give me 25 G's tomorrow morning." Folco also indicated that he could get Regine an additional $25,000 in the near future.

---

[2] Regine also had a pre-existing debt to Folco of $80,000.

At 8:19 a.m. on April 25, Folco told Regine (by telephone) "that guy's coming at eight thirty . . . . He's gonna bring me that -- package." Perrotta arrived at Folco's home at 8:33, without a golf putter. Perrotta asked Folco, "You want to count it?" Folco replied, "No, no, I'll let him [presumably Regine] count it . . . . There is 25 there?"[3] Perrotta indicated that there was. Folco explained his understanding of the terms of the loan: "that'll be 250 [one percent of $25,000) I'll give you every Tuesday." Perrotta indicated his assent.

Three minutes after Perrotta departed, Regine arrived at Folco's residence. He thanked Folco and explained that he would "take it [the $25,000] to . . . Joe," another loan shark to whom Regine was indebted at an even higher rate of interest. In an apparent reference to the second $25,000 loan which Folco and Regine had discussed, Folco said: "I talked to a guy, gonna get back to me. Gave me the bullshit, Jesus, ahh . . . I want a point and a half [one and a half percent], he give me that shit." Folco told Regine that he had rejected this proposal, but that he expected to hear from the "guy" before the end of the week.

Indeed, Perrotta phoned Folco two days later about a second "putter":

> Perrotta: You didn't like that, you didn't like that ah that putter I got yah, I got you another one.

___

[3] According to the government's transcript of the surveillance tape, Folco made a second reference to Regine, who drove a beige Infinity, in this conversation: "You probably seen the car. Ah, a beige Infin-Infinity." Perrotta disputes this interpretation of the tape, hearing instead a reference to a beige <u>couch</u>.

> Folco: Alright.
>
> Perrotta: You know and then you you whichever one you like ah you keep and ah the one you don't like you can give it to me back so I can give it to somebody else.
>
> Folco: I'll be here.

Later that day, Perrotta showed up at Folco's residence, again without a golf putter. In what the jury could have found was a reference to the schedule for interest payments, Folco said to Perrotta "[e]very Wednesday," and there was evidence that Folco and Perrotta in fact met on subsequent Wednesdays. Folco also said "I'll be like ten weeks, that's all," which the jury could have found was a statement of the term of the loan.

The following day Regine came to Folco's home. Folco reported that "[t]he guy that brought me the money yesterday[]" had supplied "[a]ll twenties." The two men counted the money and determined that it indeed amounted to "25 thousand." Regine promised to pay Folco "the other five [hundred] [two percent of $25,000] Tuesdays" (earlier in the conversation he had reiterated his existing obligation to give Folco "five" on Tuesday for the original $25,000). In other words, Folco got his money on Tuesday and Perrotta got his on Wednesday.

Consistent with the evidence summarized above, a notebook found in Folco's residence contained entries that the jury could have found were a record of two loans of $25,000 each from Perrotta to Folco. FBI expert Jerome Simpson offered the opinion that these loans, at an interest rate of one percent per week -- "below the rate of all of the other loans in this [notebook], and . . . below

-10-

the rate of any other loan that I've ever seen for a loan shark to make, putting money out on the street" -- were probably loans from one loan shark to another. As Folco explained his financial arrangements to Regine, "the guys I go see that lend money, I guarantee that money out."

This was not the first time Perrotta had advanced money to Folco, as evidenced by the following conversation between Folco and Eddie Lato, one of his "business" partners:

> Lato: You know, what he [Perrotta] does sometimes . . . you ask him for two [thousand] he freezes. He's got something about . . . I don't know if he thinks you're gonna try and rob him. . . .
>
> Folco: Today it wasn't that. Last time I asked him, "Ya, anything you want?" Took ten off him, remember."[4]

In addition, Folco made reference in a recorded conversation to an earlier "deal" he had done (for "a point") with the source of the $50,000 he was lending to Regine.

## D. The Seizure of Perrotta's Cash and Weapons

A search conducted on June 23, 1995, turned up $4,703 in cash on Perrotta's person, $4,800 in cash around Perrotta's house, two handguns and ammunition in a nightstand in a first-floor bedroom, a third handgun, brass knuckles, a fake bomb in Perrotta's garage, and a billy club in his car. The next day, Folco had the following conversation with Lato:

---

[4] Perrotta's version of this exchange denotes as unintelligible Folco's final five words ("Took ten off him, remember.")

Lato: Um.  Perrotta, they got.  I'm afraid.

Folco: What they [unintelligible] on him?

Lato: Bombs, guns, everything.

Folco:    He    ain't    worried    about [unintelligible].   If  he  blows  up.   Hm. [Unintelligible] he's dead.[5]

Lato then informed Folco that (presumably the police) "[t]ook 10 off of Perrotta," consistent with the seizure the day before of $9503 from Perrotta.  Lato reported that he had spoken to Perrotta after the raid, and that either he or Perrotta had said to the other: "it's over for us."[6]   Folco expressed concern that "[s]omebody will rat."  Lato agreed: "And they gonna say that we, we, we bankrolled the whole fucking thing."

## E. The Evidence of Perrotta's Knowledge of Folco's "Business"

First, there was evidence tending to show that Perrotta had repeated dealings with Folco in relation to Folco's money-lending operation.  The jury could have inferred from Folco's report to Cedroni that he had told "the old man" that he "might need . . . 50,000 more" (emphasis added) that Perrotta was an ongoing participant in Folco's loan sharking business.  The same inference is supported by Folco's reference to a previous "deal" he

_____

[5] Perrotta's version of this conversation denotes as unintelligible Folco's final remarks, transcribed by the government as "If he blows up.  Hm. [Unintelligible] he's dead."

[6] The jury could have so interpreted the following statement by Lato to Folco: "Took 10 off of Perrotta.  BREAK (2 seconds) [unintelligible] were, were all the time saying it's over for us. They took a shot at us huh.  I was with him last night.  He call me up.  He said uh, will you come by and take me for a ride?"

-12-

had done with the source of the $50,000, and by the conversation in which Lato and Folco discussed what Perrotta "sometimes" does when asked for money. Based on this evidence, the jury could have concluded that Perrotta was more than an unwitting, peripheral participant in Folco's loan sharking business. That inference could have been reinforced for the jury by the concern Lato expressed to Folco, after the search of Perrotta's home, that "they got" Perrotta, "I'm afraid" ("[b]ombs, guns, everything"), and by the statement by Lato or Perrotta that "it's all over for us."

Second, if the jury found that Perrotta knew that Folco was re-lending the $50,000 to a third person -- as Folco's statement to Perrotta, "I'll let him [presumably Regine] count it [the money Perrotta had just delivered]," suggests -- it could also have concluded that Perrotta must have realized that Folco and that person understood that violence or other criminal collection techniques might be used. This is because, for Folco to turn a profit, he would have had to charge interest in excess of the one percent per week he was paying Perrotta, which would make the obligation legally unenforceable in Rhode Island. See United States v. Oreto, 37 F.3d 739, 752-53 (1st Cir. 1994) (fact that loan was "grossly usurious" was a factor indicating violence might be used to collect). The jury could have credited Simpson's testimony that, in his opinion, the loan from Perrotta to Folco at the relatively low rate of one percent per week "was probably a loan from one loan shark to another," and that Folco's role in the transactions was, as he explained to Regine, to "guarantee

-13-

[Perrotta's] money out." If the jury believed that Perrotta himself was a loan shark, it could have reasoned that he must have realized that Folco was one too, and that Folco might use extortionate methods to collect the $50,000 he had borrowed from Perrotta and loaned to Regine.

In sum, while there was no direct evidence that Perrotta understood the extortionate nature of Folco's transactions with Regine, there is enough circumstantial evidence to support a jury finding that he must have realized how Folco would enforce, if necessary, Regine's repayment obligations.

### III. Admission of the Weapons

Perrotta filed a pre-trial motion in limine "to exclude, as evidence against him, all tangible evidence seized from his residence as such evidence is inadmissible pursuant to Federal Rule of Evidence 404(b) and introduction of the same would deny the defendant the fair trial to which he is entitled." At the motion hearing, Perrotta argued that introduction of the guns, brass knuckles, billy club, and fake bomb would be "highly prejudicial." Those items, he contended, are "irrelevant to the crimes charged and will clearly result in the [j]ury being invited to convict Mr. Perrotta . . . because . . . of bad character or things that the [j]ury in this climate will not like -- possession of firearms and . . . other weapons." The district court denied the motion.

At trial, police officers testified to the discovery of the guns, brass knuckles, and fake bomb in Perrotta's residence, and the billy club in Perrotta's car. Except with respect to the

-14-

brass knuckles, Perrotta made no objection to this testimony.  Nor did he raise a 404(b) objection to the recorded conversation in which Lato said to Folco "they got" Perrotta, "[b]ombs, guns, everything."[7]  However, when the government requested that the seized items be marked as exhibits, Perrotta objected on the ground of "relevance."

On appeal, Perrotta argues that the district court should have excluded the weapons under Fed. R. Evid. 404(b) as evidence of other crimes, wrongs, or acts, or because their probative value was substantially outweighed by the danger of unfair prejudice under Fed. R. Evid. 403.[8]

> To admit evidence of [other] bad acts, a trial court must find that the evidence passes two tests.  First, the evidence must have 'special relevance' to an issue in the case . . . , and must not include "bad character or propensity as a necessary link in the inferential chain."  Second, under Rule 403, evidence that is specially relevant may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

United States v. Varoudakis, 233 F.3d 113, 118 (1st Cir. 2000) (quoting United States v. Frankhauser, 80 F.3d 641, 648 (1st Cir. 1996)).  We review the district court's evidentiary rulings for abuse of discretion.  United States v. Gilbert, 181 F.3d 152, 160 (1st Cir. 1999).

---

[7]  At trial, Perrotta objected to the Folco-Lato conversation on hearsay grounds.  He does not pursue his hearsay argument on appeal.

[8]  On appeal, Perrotta does not renew his objection to the testimony about the brass knuckles.

## A. Rule 404(b)

Although Perrotta argues that the weapons had none of the special relevance to the charges against him required by Rule 404(b), he did not challenge the police testimony that the weapons were found in his possession. Nor did he challenge Lato's "[b]ombs, guns, everything" remark on special relevance grounds. Thus, even if we were to conclude that the introduction of the actual weapons lacked the special relevance required by the rule and only served to create a negative inference about Perrotta's character, we would have to consider the important fact that evidence about Perrotta's possession of the weapons was already in the case because of the testimony to which Perrotta did not object on 404(b) grounds. "Under Fed. R. Evid. 103(a), this court must review a challenged evidentiary decision to determine whether 'a substantial right of the party is affected.'" Doty v. Sewall, 908 F.2d 1053, 1057 (1st Cir. 1990) (quoting Fed. R. Evid. 103(a)). We have held that "no substantial right of the party is affected where the evidence admitted was cumulative as to other admitted evidence." Id. To the extent that Perrotta was concerned that the admission of the weapons into evidence wrongly alerted the jury to the fact that he had possessed them, any such error would be harmless. The jury already knew that fact from the testimony of witnesses about the weapons.

For the sake of completeness, however, and to dispel any notion of unfairness surrounding the admission of the testimony about the weapons, we add that if Perrotta had objected to the

-16-

testimony about the weapons, and had not limited his objection to their introduction into evidence, his objection would have been meritless. Testimony about the discovery of the guns, brass knuckles, billy club, and fake bomb in Perrotta's home and car had the special relevance to the government's case required by Rule 404(b). In a conversation recorded the day after the search of Perrotta's home and car, Lato said to Folco that he was "afraid" that "[b]ombs, guns, everything" had been taken from Perrotta. The Folco-Lato conversation in all of its detail was probative of the relationship between Perrotta and Folco, revealing an alarmed reaction by Folco and Lato to the investigation of Perrotta, and thereby suggesting that Perrotta was a significant player in their loansharking operation. In addition, their awareness of the details of the seizure from Perrotta so soon after it happened was further evidence of their close relationship with him. Perrotta's contention that the weapons had no relevance except to support a negative inference about his character is therefore without merit.

The government also argues that the seized weapons were relevant generally as "tools of the trade" of extortion because they are useful to protect the lender and intimidate borrowers, and thus they tend to show that Perrotta was a loan shark. We have said that "in drug trafficking firearms have become 'tools of the trade' and thus are probative of the existence of a drug conspiracy." United States v. Green, 887 F.2d 25, 27 (1st Cir. 1989). The government urges us to extend the "tools of the trade" rationale for the admission of weapons to the crime of extortion,

reasoning that weapons are tools of the loan shark's trade just as they are tools of the drug dealer's trade, and thus are probative of loan sharking activity. United States v. Gilley, 836 F.2d 1206, 1214 n.9 (9th Cir. 1988) (noting that the "tools of the trade" doctrine might be applicable to extortion). The district court appeared to endorse the government's "tools of the trade" theory in denying Perrotta's motion to exclude the weapons. In our view, however, there are three reasons why this was a poor case for the government to urge extending the tools of the trade doctrine to the crime of extortion: (1) the government does not claim that Perrotta himself used threats of violence to enforce debts owed to him; (2) there was little left of Perrotta's relevance objection after he did not object to the testimony about the weapons; and (3) the weapons had a case-specific relevance to the charges against Perrotta that we have already described. See Gilley, 836 F.2d at 1214 n.9 ("Where, as here, a clear nexus exists between the evidence and the crime charged, no resort need be made to the 'tools of the trade' doctrine."). Because resort to the tools of the trade doctrine was unnecessary in this case, we do not address the merits of the government's argument.

**B. Rule 403**

Perrotta also argues that the weapons should have been excluded under Rule 403, as their probative value was substantially outweighed by the danger of unfair prejudice. Since the jury was not being asked to make any specific determinations concerning the physical characteristics of the weapons, we discern no particular

reason why the jury needed to see the actual weapons.  However, it is a commonplace of trial practice that testimony about physical objects often leads to their introduction into evidence.  That introduction serves to corroborate the testimony about the existence of the objects, a purpose captured by the familiar phrase "seeing is believing."[9]  This added increment of probative value is appropriate unless it is substantially outweighed by the danger of unfair prejudice to the defendant. Fed. R. Evid. 403; see also United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989) ("[A]ll evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided." (emphasis in original)).

"'[O]nly rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.'" United States v. Pitrone, 115 F.3d 1, 8 (1st Cir. 1997)(quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)). Here, the government has been unable to explain why the jury needed to see the actual weapons, beyond the usual corroborative purpose

_____

[9]   See 2 McCormick on Evidence § 212 (5th ed. 1999) ("Since 'seeing is believing,' and demonstrative evidence appeals directly to the senses of the trier of fact, it is today universally felt that this kind of evidence possesses an immediacy and reality which endow it with particularly persuasive effect." (footnote omitted)). Of course, McCormick is not the author of this phrase, which the Second Circuit has described as "[a] proverb current even in the days of ancient Rome." Coca-Cola Co. v. Tropicana Products, Inc., 690 F.2d 312, 314 (2d Cir. 1982); see also Johnson v. United States, 162 F.2d 562, 563  (9th Cir. 1947) ("well-known maxim"); O'Leary v. Liggett Drug Co., 150 F.2d 656, 666 (6th Cir. 1945) ("common-sense adage").  But see Finley v. Marathon Oil Co., 75 F.3d 1225, 1231 (7th Cir. 1996) ("misleading old saw").

served by the introduction of the objects themselves.  By the same token, however, we see no unfair prejudice from the introduction of the guns and the fake bomb into evidence.  The district court instructed the jury that there was no evidence that Perrotta had possessed the guns illegally, and there was testimony that the bomb was a fake.  Nothing in the record suggests that the guns or the fake bomb would have inflamed the jury or inspired them to decide the case on an emotional basis.  See Varoudakis, 233 F.3d at 122 ("Usually, courts use the term 'unfair prejudice' for evidence that invites the jury to render a verdict on an improper emotional basis.").

Similarly, although the brass knuckles and billy club were surely unfamiliar items to the jurors,[10] and were real rather than fake, we again see nothing in the record to suggest that the brass knuckles and billy club would have inflamed the jury to decide the case on an emotional basis.  See id.  We therefore conclude that the district court did not abuse its broad discretion in admitting the weapons seized from Perrotta into evidence.

### IV. Suppression of the Weapons

Perrotta argues that the seizure of his weapons violated the Fourth Amendment because the weapons were not described in the search warrant.  His argument ignores the plain view doctrine, which permits the seizure of items located in plain view if "(1) the seizing officer has a prior justification for being in a

---

[10] The possession of brass knuckles and billy clubs is illegal in Rhode Island.  The jurors, however, were not so advised.

position to see the item in plain view and (2) the evidentiary value of the item is immediately apparent." <u>United States</u> v. <u>Owens</u>, 167 F.3d 739, 746 (1st Cir. 1999). Evidentiary value is "immediately apparent" if there are "enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime." <u>United States</u> v. <u>Hamie</u>, 165 F.3d 80, 83 (1st Cir. 1999).

Perrotta fails to explain why the plain view exception is inapplicable to this case. The search was conducted pursuant to an investigation of a loansharking conspiracy that used violence to enforce repayment obligations. The officers had reason to believe that the weapons could have evidentiary value in connection with their investigation, as Perrotta could have used the weapons to collect debts or to protect his cash. It makes no difference that the weapons were not used to commit the crimes for which Perrotta was convicted; the Fourth Amendment requires simply that the investigators, at the time of the seizure, had reasonable grounds to believe that the items "may [have been] contraband or evidence of a crime."[11] <u>Id.</u>

## V. Due Process

Perrotta argues that 18 U.S.C. § 893 violates the Due Process Clause of the United States Constitution in proscribing the advancement of money to a person "with reasonable grounds to

---

[11] The justification for the seizure of the billy club and brass knuckes is even more straightforward: these items are illegal in Rhode Island.

believe" that the person intends to use the money to make an extortionate extension of credit.  Perrotta's position is that the quoted language "invites confusion in the application of the 'beyond a reasonable doubt' standard, and could easily lead the jury to convict under this statute if the jury has 'reasonable grounds' to believe the Defendant is guilty."

Perrotta cites no precedent that supports his view of § 893, or of its implications for any of the other federal statutes that include the same or similar language.  See, e.g., 18 U.S.C. § 2388(c) (activities affecting armed forces during war) (punishing "[w]hoever harbors or conceals any person who he knows, or has reasonable grounds to believe or suspect, has committed . . . an offense under this section") (emphasis added); 18 U.S.C. § 1030(a)(1) (punishing, inter alia, whoever "having knowingly accessed a computer without authorization . . . and by means of such conduct having obtained information that has been determined by the United States Government . . . to require protection against unauthorized disclosure, . . . with reason to believe that such information so obtained could be used to the injury of the United States, . . . willfully communicates, delivers, transmits, or causes to be communicated, delivered, or transmitted . . . the same to any person not entitled to receive it") (emphasis added); 18 U.S.C. § 842(c) ("It shall be unlawful for any licensee to distribute explosive materials to any person who the licensee has reason to believe intends to transport such explosive materials into a State where the purchase, possession, or use of explosive

materials is prohibited. . . .") (emphasis added).  Nor does he explain why the government is wrong to suggest that "Congress surely has the power to adopt different standards of intent for the mens rea elements of federal crimes, so long as the jury must find beyond a reasonable doubt that the defendant acted with the given level of intent in committing the crime."  In the absence of any explanation, his argument verges on the frivolous.

**Affirmed.**