USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 94-2005 UNITED STATES OF AMERICA, Appellant, v. WALTER L. LACHMAN, MAURICE H. SUBILIA, JR., FIBER MATERIALS, INC., MATERIALS INTERNATIONAL, Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Douglas P. Woodlock, U.S. District Judge] ___________________ ____________________ Before Selya, Boudin and Stahl, Circuit Judges. ______________ ____________________ James D. Herbert, Assistant United States Attorney, with _________________ whom Donald K. Stern, United States Attorney, and Despena Fillios _______________ _______________ Billings, Assistant United States Attorney, were on brief for the ________ United States. Nicholas C. Theodorou with whom Anthony Mirenda, Michael _______________________ ________________ _______ Boudett, Foley, Hoag & Eliot, Bruce A. Singal and Ferriter, _______ _____________________ _________________ _________ Scobbo, Sikora, Singal, Caruso & Rodophele were on joint brief _______________ ___________________________ for appellees. ____________________ February 23, 1995 ____________________ BOUDIN, Circuit Judge. This is an interlocutory appeal _____________ by the government under 18 U.S.C. 3731 contesting an evidentiary ruling made prior to trial in a criminal case. In the challenged ruling, the district court excluded from the government's case-in-chief 13 exhibits that the government deems of great importance. Finding that the district court did not abuse the discretion it possesses under Fed. R. Evid. 403, we affirm. I. On July 8, 1993, a grand jury returned an indictment charging that four named defendants conspired to (count I), and did in fact (count II), violate the Export Administration Act of 1979 ("the Export Act"), 50 U.S.C. App. 2410(a), and its implementing regulations. The defendants were two corporations--Fiber Materials, Inc., and its subsidiary Materials International--and the two top executive officers of the companies: Walter L. Lachman and Maurice H. Subilia. The "facts" that follow largely reflect the government's allegations (as yet unproved). Fiber Materials has been engaged for 25 years in the production of composite materials for industrial and aerospace applications. Most of its business relates to technology for the manufacture of carbon/carbon, a category of materials that can be made to withstand intense heat and pressure. Over two-thirds of Fiber Materials' work is for -2- -2- the U.S. military. Materials International markets its parent company's materials, technologies and services overseas. One of the technologies in which Fiber Materials is expert relates to the hot isostatic press; the press is a complex piece of industrial equipment that contains an internal cavity and uses high pressure gas or liquid to subject materials to intense pressure and a furnace to produce extreme heat. Carbon/carbon, when "densified" by this process, becomes suitable for use in rocket components, including ballistic missiles with nuclear capability. Fiber Materials generally subcontracts the manufacture of equipment such as the press to others but provides the expertise. In 1984, the Indian government's Defense Research and Development Laboratory ("the Indian Defense Laboratory") issued a request for proposals to outfit a carbon/carbon facility in India for use in rocket and missile development. Fiber Materials won the bid and in 1985 signed a contract with the Defense Laboratory. Among other things, the contract called for Fiber Materials to supply a hot isostatic press with a cavity 26 inches in diameter, and a control panel for the press; such a panel contains controls to heat, pressurize and otherwise operate the press. Under the Export Act, various goods and technologies are subject to different levels of export control for reasons of -3- -3- foreign policy, national security or scarcity. As one facet of this regime, the Commerce Department maintains a list of commodities that may not be exported without an individual license. Item ECCN 1312A on this list, as the list existed in the late 1980s, covered hot isostatic presses with a cavity diameter of 5 inches or more and any "components, ___ accessories and controls" that were "specially designed" for such presses. Export to any country except Canada required a license; and the stated reasons for the restriction were "national security" and "nuclear non-proliferation." 15 C.F.R. 399.1, Supp. 1 (1988) (later revised and renumbered). In January 1987, Fiber Materials and the Indian Defense Laboratory modified their contract to call for a hot isostatic press with a cavity diameter of 4.9 inches and a control panel for the press. According to the government, Subilia wrote to the Indian Defense Laboratory to assure the laboratory that the control panel to be supplied under the new contract could in the future be used with a larger hot isostatic press. In early 1987, the defendants were allegedly told by the government that certain other items in their contract, which required individual licenses, would probably not be licensed because of security concerns. In March 1988, Materials International entered into a contract with the Indian Defense Laboratory to have a hot -4- -4- isostatic press with a cavity diameter of 26 inches made by a third party in Switzerland (which did not prohibit such exports) and shipped directly to India. A month later, defendants exported the original 4.9 inch press, along with its control panel, from the United States to India without seeking or receiving a Commerce Department license. A year and a half later, the 26 inch press was sent from Switzerland to India. In 1991 and 1992, defendants sent employees of Fiber Materials to India to install the equipment and, specifically, to connect the U.S.-made control panel to the large Swiss-made hot isostatic press. On July 8, 1993, the four defendants were indicted in two counts for knowingly conspiring to violate, and knowing violation of, the Export Act and its regulations. 15 U.S.C. App. 2410(a). The commodity whose export was claimed to be unlawful was not the 4.9 inch press but the control panel. II. Pretrial proceedings were extensive. In June 1994, the district court set trial to begin on July 25 and ordered the government to provide a list of proposed exhibits to defendants by July 1. On July 1, the government filed a very lengthy list of exhibits. On July 19, the defendants filed a motion in limine aimed at excluding many of these exhibits __________ relating to the alleged "end use" of the exported items for missiles and nuclear weapons. The government then discarded -5- -5- many of its exhibits but opposed the exclusion of others objected to by defendants. In the meantime trial was deferred until August. Perceiving that judgments about relevance might be affected by the scienter instructions at trial, the district court addressed that issue. With the government acquiescing, the court ultimately adopted the defendants' theory of intent: the court held that the "knowing[] violat[ion]" requirement of 50 U.S.C. App. 2410(a) required the government to prove that the defendants knew that the control panel required an individual license. Compare United States _______ _____________ v. Gregg, 829 F.2d 1430, 1437 (8th Cir. 1987) (imposing such _____ a knowledge requirement) with United States v. Shetterly, 971 ____ _____________ _________ F.2d 67, 73 (7th Cir. 1992) (rejecting it). This issue is not before us, and we express no view upon it. The district court held a hearing on August 3 and, in an oral ruling, excluded 13 of the governments' exhibits from use in its case-in-chief. As to nine other exhibits, the court declined to rule before the exhibits were offered at trial, but it expressed "intense skepticism" about admitting some of them. The government voluntarily withdrew 21 other challenged exhibits. Although the excluded exhibits number 13, they actually comprise four different collections, one of which accounts for 10 of the exhibits: -6- -6- The first (gov. ex. EK) is a 121-page file belonging to the Institute for Defense Analysis, a U.S. industry working group that assists the Defense Department with its own program to identify militarily critical technologies. The defendant Subilia was a member of the group. The 121-page file contained records of working group meetings in 1985. The records indicate that at one meeting Subilia attended, carbon/carbon was discussed and a copy of ECCN 1312A was distributed. The file contains many references to munitions and weapons, and considerable material relating to commodities not at issue in this case. The second file of excluded documents (gov. exs. DW through EF) consists of 10 newspaper clippings found in the files of Materials International. These articles discuss the Indian government's "AGNI" missile program. None refer to hot isostatic presses or their control panels. All but one of the articles are dated in 1989, more than a year after the export of the control panel in this case. Each of the 10 newspaper articles was designated as a separate exhibit. The third (gov. ex. AA1 through 5) is a group of documents comprising defendants' registrations and renewal applications filed with the State Department. That department maintains its own "munitions" list of controlled exports, a list distinct from that of the Commerce Department. The State Department list does not cover hot -7- -7- isostatic presses or their control panels. The defendants' filings with the State Department pertained to their activities as exporters of carbon/carbon. The documents do identify the U.S. military as customers of Fiber Materials. The fourth (gov. ex. AE) is the Indian Defense Laboratory's 1984 request for proposals for the carbon/carbon processing facility. This was the proposal for which Fiber Materials submitted the winning bid; as earlier noted, the original arrangement for a larger hot isostatic press was modified in 1987 to call for one of 4.9 inches. The exhibit indicates that the Indian carbon/carbon facility would be used in connection with rocket and missile development. The district court's reasons for excluding these exhibits have to be discerned from the transcript of the hearing on August 3, a hearing that embraced issues and documents in addition to the 13 exhibits now in dispute. In excluding the 121-page file, the court referred to Rule 403 and called the materials duplicative, redundant and potentially misleading. The State Department registration papers were described more briefly in the same terms. In excluding the 1984 request for proposals, the district court called it "preliminary." We think that a fair reading of the transcript as a whole indicates that the trial court thought that some of the material in the 13 exhibits was irrelevant and some of -8- -8- marginal relevance; that it saw in the references to missiles and nuclear weapons a potential for jury prejudice; and that it was concerned also, in the case of the 121-page document and the State Department materials, with a problem of jury confusion because of the references to materials other than the press and controls at issue and references to regimes other than the Commerce Department licensing controls. At the same time, in the course of the hearing, the district court told the defense that the government would be given some latitude to present to the jury the defendants' "familiarity with the regime of regulation" and "the resistance that the Government may have to allowing awards of licenses in an area of some sensitivity." This, said the court, followed from the defendants' own success in making knowledge of the legal restrictions an element of the government's case. The court concluded by warning that "I haven't finally ruled on this issue." On August 5, the government asked the district court to reconsider its exclusion of the 13 exhibits and the court denied the motion. The government then announced that it would appeal the court's ruling, and the trial scheduled to begin three days later was continued indefinitely. A further request by the government to the district court to reconsider its ruling also failed. This appeal ensued. III. -9- -9- Certain types of exclusionary rulings in criminal cases are commonly made before trial, such as rulings on the validity of a search and seizure or the voluntariness of a confession. In most other cases, judges are hesitant to rule finally on evidentiary questions in advance of trial. The role and importance of the disputed evidence, its fit with other evidence in the case, and even the precise nature of the evidence may all be affected by, or at least more clearly understood within, the context of the trial itself. At the same time, determining the admissibility of a piece of evidence may sometimes require a potentially lengthy factual inquiry (e.g., whether a new class of scientific ____ evidence is admissible). Or the entire structure of the case, and the parties' preparations, may turn on whether a central piece of evidence is to be admitted. Thus, while caution needs to be exercised, trial judges have discretion to make purportedly final advance rulings to admit or exclude evidence. We say "purportedly" because judges in ongoing proceedings normally have some latitude to revisit their own earlier rulings. In this case, neither side disputes that the district court was entitled to rule in limine on the 13 exhibits in __________ question. The only question is whether the court abused its discretion under Rule 403 in determining that these exhibits should be excluded. The government admits that the standard -10- -10- of appellate review as to such rulings is deferential to the district court, but says that discretion is not unlimited. It is certainly true that essentially legal issues may be embedded in such a decision; and we agree that even the exercise of discretionary judgment is subject to outer limits. See United States v. Roberts, 978 F.2d 17, 21 (1st ___ ______________ _______ Cir. 1992). Rule 403 calls upon the district court to weigh the probative value of evidence against the harms that it may cause--unfair prejudice, confusion, misleading the jury, delay or repetition--and to exclude the evidence if the probative value is "substantially outweighed" by the harms. The government does not argue that the trial judge misstated Rule 403 or misunderstood the factors; rather, the claim is that the court struck the wrong balance. One can start the analysis at either end of the balance scale. In this case, it is convenient to begin our discussion with the probative value of the evidence in question. Normally, in order to have probative value, evidence must be "relevant" under Fed. R. Evid. P. 401, that is, it must tend to make an issue in the case ("a fact of consequence") more or less likely than would be so without the evidence. United States v. Tavares, 21 F.3d 1, 5 (1st _____________ _______ Cir. 1994) (en banc). Other factors that may bear on probative value are the importance of the issue and the force -11- -11- of the evidence. 22 C. Wright & K. Graham, Federal Practice ________________ and Procedure 5214 (1978). In this case, the government's ______________ most difficult problem throughout has been explaining why and how the exhibits in question are relevant to an issue in the case. The core of the charges in the indictment are that the defendants knowingly agreed to, and did in fact, export a commodity that requires an individual license without obtaining such a license. A commodity requires such a license if it appears on the Commerce Department list of such commodities. See 50 U.S.C. App. 2403(b), 24049(a); 15 ___ C.F.R. 372.2(b)(1) (1988). The listed item in question--a specially designed control panel--is described primarily in terms of its relationship to another, technically described item (a hot isostatic press with a cavity of 5 inches or more). The end use of the products to be made by the control panel and press is not an explicit element in the definition. By contrast, the most prominent feature of the exhibits in question--and the aspect most objected to by defendants-- is their tendency to show that the control panel might well be used to foster the development of weaponry including nuclear missiles. This is the gist of the 10 newspaper clippings concerning the Indian government's AGNI missile program. Military uses of the carbon/carbon materials produced by the hot isostatic press are one subject of the -12- -12- 121-page file. The State Department registration papers serve to associate Fiber Materials with military projects. The 1984 request for proposals suggest that the original larger press was sought for missile development. The government seeks to connect the offense with the exhibits primarily by arguing that the evidence helps to show scienter. The government here has acquiesced in a stringent, and relatively rare, instruction that--to make out a violation--the defendants must not only have known what they did, but also have known that it was forbidden. Where the offense is one grounded in technical regulations and the conduct not inherently likely to be unlawful--the legal tag is malum prohibitum--this burden will often be a heavy one ________________ for the government. Although the government's brief does not spell out the connections systematically, we think that such a scienter requirement might arguably make portions of the exhibits in question relevant in several different ways. The broadest utility would be to suggest that, knowing of the potential military use of the press and the Indian government's interest in such a use, the defendants had more reason in prudence, and were therefore more likely in fact, to have reviewed and considered the general state of the law and the specific regulations governing the export of the commodity. -13- -13- Of course, a jury might assume that a company in the business of high-tech developments and their export would make itself aware of the pertinent export regulations. But the government is expected to prove each separate element of the offense beyond a reasonable doubt; and where knowledge must be proved by inference, the government is quite right not to take a casual view of its burden. The skull-and- crossbones insignia on the medicine bottle does not prove that the defendant read the small print instructions; but it does tend to increase the likelihood. Two other, more specific uses have been suggested by the government for certain materials in the exhibits: to show, in the case of one page in the 121-page compilation, that Subilia was given a copy of item ECCN 1312A; and to indicate, by showing who signed the State Department registration papers, which persons in the corporate defendants took responsibility for compliance. These uses, however, could be satisfied by far less the full offerings made by the government--the item page in the former case and the signature page in the latter, together with context testimony. Lastly, the government's brief suggests or implies that the exhibits (especially the news clippings and the 1984 request for proposals)--by implicating the likely military end uses of the larger press and control panel--support a -14- -14- double proposition: that the Commerce Department would not have granted a license for the control panel in this case if a license had been sought, and that the defendants (being aware of the exhibits) knew this to be true. This argument raises the subtlest problem in the case. The defendants say indignantly (and correctly) that the crime charged relates to exporting listed commodities without a license, not to exporting commodities that the government would decline to license. Put differently, if a commodity is not listed, its export does not violate this statute no matter how vehemently the government objects to its export or how swiftly it would deny a license if asked. The government's opening brief is so framed as to invite this response and to make it difficult to tell what other, more defensible use of the double inference might be available. The government's reply brief, however, offers (in a lengthy footnote) two rebuttal arguments. One is that defendants' knowledge that a license would likely be refused helps, as part of a pattern of other evidence, to show that the defendants' failure to apply for the license was out of design and not a mistake of law. The other is that the known intended end use has some bearing on the purpose for which the control panel was designed and thus on whether it was "specially designed" for use with a larger press; this last -15- -15- argument, needless to say, turns partly on how the phrase "specially designed" is to be read. Against these arguments for relevance must be set two major concerns voiced by the district court. The first involves the likelihood of undue prejudice, which the district judge summed up by saying that he would not allow this to become a missile case. Evidence is not unduly prejudicial merely because it tends toward conviction; most useful evidence for the government does that. The concern is with any pronounced tendency of evidence to lead the jury, often for emotional reasons, to desire to convict a defendant for reasons other than the defendant's guilt. United States _____________ v. Moccia, 681 F.2d 61, 63 (1st Cir. 1982).  ______ In this case the district court had every reason to be alert to this possibility. The government's disputed exhibits (apart from the State Department papers) tend to suggest that the defendants knew that they were aiding a project to develop missile technology for the Indian government. We can ignore, for present purposes, the arguable chronological flaw in relying on the nine clippings that post-date the exports in question (and the government's interesting counter-argument). The 1984 request for proposals, the 121-page compilation and the earliest press clipping are potent enough. -16- -16- A jury, conscious of the risks of nuclear proliferation and of U.S. government efforts to halt it, could easily regard the defendants' alleged conduct as highly unattractive even if it turned out to be technically legal. Other aspects of the defendants' conduct (the 4.9 inch figure, the export from Switzerland) could reinforce the adverse impression. Any effort to dwell at length on the Indian government's nuclear missile program and potential use of the press and control panel in this case risks throwing gasoline on a flickering flame. A judge would be blind not to see this danger and to fear it. Prejudice is not the only threat. There is also a potential for confusing and misleading the jury. Quite apart from prejudice, there is a risk that an undue emphasis on the end use of the exported commodities could divert the jury's attention from whether the commodity is listed and known to be so, to whether the commodity is to be used for military purposes. This deflection might seem like a gross error, fairly easy to guard against in the instructions so far as confusion is concerned (prejudice is a different matter); but it is not the only problem. As our discussion has already shown, the government is interested in proving the known and intended military uses not only to support its skull-and-crossbones theory of heightened awareness but also to show that the government -17- -17- would have denied a license. This, in turn, invokes arguments as to how this alleged fact--at first seemingly irrelevant to the offense of not asking for a required license--may help the government show scienter and even help it show why the control panel should be deemed a listed commodity. These arguments, raised tersely in the government reply brief, may or may not have some basis in law and logic. What is clear is that ample opportunity exists for jury confusion if exhibits are justified and used in order to show that the government would not have issued a license. It would be quite a task to explain to a jury that this "fact" is not an element in the violation but merely part of a subtle and debatable chain of inferences designed to use this license denial to show scienter and, more doubtfully, the character of the control panel. We ourselves have had some difficulty disentangling the government's theory of the offense from these more recherche relevance arguments. What we have said so far is that the district court was balancing claims in which there was weight on both sides of the scale. The evidence in question has some relevance--most clearly on the skull-and-crossbones theory; but (putting aside the single document page quoting item ECCN 1312A) it is not direct evidence of knowledge of the law. At the same time, the risks of undue prejudice are quite evident; and risks of confusion are real too, especially if the government -18- -18- is allowed to develop and argue some of its more subtle and questionable inferences. This dual threat of prejudice and confusion is alone enough to lend support to the district court's decision. Our discussion thus far has not touched upon the government's need for this evidence and the closely related ____ question of alternatives available to it. In applying Rule 403, it is plainly pertinent whether a litigant has some alternative way to establish a fact that involves no (or at least a lesser) risk of prejudice or confusion. 22 Wright & Graham, supra, 5214 (citing cases). But here, in an _____ interlocutory appeal, we do not know very much about how else the government might at trial seek to establish the defendants' knowledge of the regulatory regime and the finer shades of its likely interpretation. What we do know is that the district court thought that the government did have some less dangerous, if perhaps less potent, means of establishing the defendants' familiarity with the regulations and with the delicacy of their position. As already noted, the court said that it was prepared to give the government some leeway in this area. One can hardly doubt that some evidence is available: merely as an example, the selection of a 4.9 inch figure for the press pretty much shows that someone in the organization knew about item ECCN 1312A. -19- -19- We think that the district court further showed a wise flexibility in two other respects. It limited its exclusion of the 13 exhibits in question to the government's case-in- chief, knowing that positions taken or testimony offered by the defense might warrant the court in relaxing the ban for purposes of cross-examination or rebuttal. On a substantial number of other exhibits objected to by defendants, the court reserved its ruling, most likely until the evidence is actually offered at trial. The court's exclusion of 13 exhibits certainly did not reflect a heavy-handed and inflexible constraint. We turn finally to a narrow concern that bolsters the district court's decision on one remaining open point. In the 121-page file a copy appears of item ECCN 1312A itself. Unlike much of the excluded material, this page is directly pertinent to the knowledge of at least one individual defendant as to the existence of this item, and one might think that this part of the exhibit ought to have made it through the filter. The government mentions the page but lays no special stress upon it. Perhaps it does not expect the defendants to deny that they were aware of the regulations. The district court expressed concern that this exhibit as a whole was a jumble of material, some rather patently unrelated to anything in this case. The government had, and -20- -20- presumably still has, the option of identifying specific pieces of information in the exhibit and urging that they be considered separately from the rest. Without generalizing too broadly, it is normally the case that this kind of segregation is the job of counsel and not an already burdened district judge. See Brooks v. Chrysler Corp., 786 F.2d 1191, ___ ______ ______________ 1199 (D.C. Cir.), cert. denied, 479 U.S. 853 (1986). ____________ We conclude that the district court had an ample basis under Rule 403 for excluding the 13 exhibits in question. We commend the trial judge's thoughtful approach to the problems presented and his efforts to balance the legitimate interests on both side. The government may on reflection think that it has cause to be grateful to the district court--both for eliminating possible errors that could infect a trial and, hopefully, for forcing the government to consider its theories of the offense and of relevance with somewhat greater precision before they are exposed to a jury. IV. Problems that can be treated with some confidence in context are often very difficult to solve before other pieces of the puzzle have been assembled. This, as we have said, is why district courts are often hesitant to decide evidentiary questions before trial. A like difficulty arises for an appellate court where, as here, an interlocutory appeal brings to the court only a part of the case. Thus, our task -21- -21- might be simplified if we could speak with assurance about the standard of scienter or, for that matter, the definition of "specially designed." But these are not issues that have been briefed in this court, we have not sought to address them, and nothing in this opinion should be taken to suggest any view whatever as to how those issues should be resolved. Similarly, we stress again that what we have taken to be facts depends almost entirely on the indictment and other descriptions of what the government thinks it can prove. Any assertions of "fact" in this opinion, including descriptions of documents or the inferences to be drawn from them, are without prejudice to what the trial may show or what may emerge after more context has been supplied. All that we hold is that the district court did not ____ abuse its discretion in excluding at this time from the government's case in chief the 13 disputed exhibits, each taken as a whole. Within very broad limits, the district court is free to reexamine its position on any issue as the case develops. See generally United States v. Uccio, 940 ______________ _____________ _____ F.2d 753, 758 (2d Cir. 1991). We say this not to suggest any disagreement whatever with the district court's rulings but simply to underscore the limits on what this court has ____ decided. -22- -22- With these stipulations, the order under review excluding the 13 exhibits is affirmed. ________ -23- -23-